STEPHEN J. ERIGERO (NV Bar No. 11562)
**ROPERS MAJESKI PC**
3753 Howard Hughes Parkway, Suite 200
Las Vegas, Nevada 89169
Phone:    (702) 954-8300
Facsimile: (213) 312-2001
Email:  stephen.erigero@ropers.com

Attorneys for Plaintiff ADVENTUREMOBILE INC.

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA – CLARK COUNTY**

ADVENTUREMOBILE INC.,

               Plaintiff,

      v.

RLD DESIGN LTD, a South African
Company; and DOES 1-25, Inclusive,

          Defendants.

CASE NO. _____

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**(1) Breach of Written Contract (Exclusive Distribution Agreement);
(2)  Breach of Written Contracts – Continuous and Ongoing Breach of Exclusive Distribution Agreement and Breach of Purchase Orders and Invoices;
(3) Breach of Covenant of Good Faith and Fair Dealing;
(4) Intentional Interference with Contractual Relations;
(5) Negligent Interference with Contractual Relations;
(6) Intentional Interference with Prospective Economic Advantage;
(7) Unjust Enrichment;
(8) Defamation; and
(9) Injunctive Relief**

**DEMAND FOR JURY TRIAL**

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

4866-9657-1948.2

COMPLAINT FOR DAMAGES

1    Plaintiff ADVENTUREMOBILE INC. brings claims for relief against Defendant RLD

2  Design, Ltd; and DOES 1 through 25, inclusive, as follows:

3                              **THE PARTIES**

4    1.    Plaintiff ADVENTUREMOBILE INC (hereinafter referred to as "Plaintiff" or

5  "Adventuremobile") is now, and at all relevant times mentioned in this Complaint, a corporation

6  incorporated in the State of Nevada with its principal place of business in Seattle in the State of

7  Washington.

8    2.    Defendant RLD Design Ltd (hereinafter "Defendant" or "RLD") is now, and at all

9  relevant times mentioned in this Complaint was and is, a company formed in the country of South

10  Africa.

11    3.    The true names and capacities, whether individual, corporate, associate or

12  otherwise of Defendants DOES 1 through 25, inclusive, are unknown to Plaintiff, who therefore

13  sues said defendants by such fictitious names.  Plaintiff will amend this complaint to allege true

14  names and capacities when ascertained.  Plaintiff is informed and believes and based upon that

15  information and belief alleges that each of the fictitiously named defendants is indebted to

16  Plaintiff as alleged in this complaint, and that Plaintiff's rights against the fictitiously named

17  defendants arise from this indebtedness.  Defendant DOES 1 through 25, and each of them, were

18  responsible for RLD's breach of Exclusive Distribution Agreement, RLD's continuous and

19  ongoing breach of Exclusive Distribution Agreement, Orders and invoices.  Further, Defendant

20  DOES 1 through 25, and each of them, intentionally or negligently interfered with

21  Adventuremobile's existing contracts with its dealers and customers and also intentionally

22  interfered with Adventuremobile's prospective economic advantage as fully set forth in this

23  complaint.  Defendant DOES 1 through 25, and each of them, were unjustly enriched as a result

24  of their actions and omissions at the expense of Adventuremobile.  Defendant DOES 1 through

25  25, and each of them, published false statements about Adventuremobile to Adventuremobile's

26  dealers and customers that resulted in injury to Adventuremobile's business reputation and loss of

27  business and income.

28  / / /

4866-9657-1948.2

**COMPLAINT FOR DAMAGES**

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

1    4.    DOE defendants do not defeat diversity jurisdiction because pursuant to Nevada

2    Rule of Civil Procedure 10, Nevada permits Doe pleading to extend the statute of limitations, and

3    where a federal court sits in diversity, it must adopt state substantive law.  Congress amended §

4    1441(b) to provide that "the citizenship of defendants sued under fictitious names shall be

5    disregarded" in determining removability of civil actions. *Universal Commc'n Sys., Inc. v. Lycos,*

6    *Inc*., 478 F.3d 413, 426, fn. 10 (1st Cir. 2007).  Plaintiff requests this Court to re-examine whether

7    there is complete diversity at the time a defendant is substituted for a Doe later in the case.

8    *Gardiner Family, LLC v. Crimson Resource Mgmt. Corp.* 147 F.Supp.3d 1029, 1035 (ED CA

9    2015) [plaintiff's use of fictional defendants does not destroy diversity and does not divest district

10    court of jurisdiction].

11    5.    Plaintiff is informed and believes, and based thereon alleges, that at all times

12    mentioned herein, each of the defendants were the agents of each of the remaining defendants and

13    was acting within the course and scope of such agency, and each defendant has ratified and

14    approved the acts of its/his/her agents.

15    ## VENUE AND JURISDICTION

16    6.    This Court has subject matter federal diversity jurisdiction over all claims pursuant

17    to 28 U.S.C. § 1332 because Plaintiff is a corporation which is a citizen of the states of Nevada

18    and Washington and Defendant is a citizen of a foreign country, South Africa.  The amount of

19    controversy, exclusive of interests and costs, is at least $350,000 that far exceeds the sum or value

20    of $75,000.

21    7.    This Court also has jurisdiction over the parties in this action because the parties'

22    Exclusive Distribution Agreement (also referred to as "EDA" or "agreement") requires that the

23    parties submit to the jurisdiction of the United States District Court in Nevada.  Specifically, the

24    Exclusive Distribution Agreement provides in pertinent parts as follows:

25    "18. GOVERNING LAW AND JURISDICTION
      1. Regardless of the place of execution, performance or domicile of
26    the Parties, this Agreement and all modifications and amendments
      thereto shall be governed by and construed under and in accordance
27    with the **substantive laws of the State of Nevada**.
      2. The Parties hereby **irrevocably agree and consent to the exclusive**

28

- 3 -

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

**COMPLAINT FOR DAMAGES**

***jurisdiction of the state and federal courts located in Clark County, State of Nevada***, in respect of all matters arising out of and disputes in connection with this Agreement …"  (Exclusive Distribution Agreement, Clause 18, subparagraphs 1-2) (emphasis added.)

8.      Venue is proper in this district under 28 U.S.C. § 1391(b) in that Defendant is subject to personal jurisdiction in this district pursuant to the parties' Distribution Agreement.

## SUMMARY OF CASE

9.      Adventuremobile is the distributor for North America of automobile parts that it imports from a company based in South Africa, RLD Design.  The parts are actually stainless-steel canopies that one can add to the bed of a pickup truck to turn it into a sort of camper.

10.     Adventuremobile and RLD's business relationship began in 2018 pursuant to an exclusive distribution agreement that was renewed in March 2021.  Because there is no dispute arising out of the previous exclusive distribution agreement, all references to the exclusive distribution agreement in this complaint refers to the agreement executed in March 2021, the Exclusive Distribution Agreement.

11.     Due to RLD's actions and omissions, the parties' relationship has deteriorated to the point that makes filing of this complaint necessary.  For a period of several months, Adventuremobile attempted to resolve the issues amicably without the intervention of the Court, including keeping constant communications with RLD about the problems Adventuremobile has been facing as set forth below.

12.     Beginning several months ago, Adventuremobile reported to RLD that there have been numerous problems and issues with the RLD products.  RLD agreed to credit Adventuremobile the sum of $8,500 per invoice for ten (10) invoices (for a total sum of $85,000) to reimburse Adventuremobile for some of the issues related to the unannounced packaging change. RLD also agreed to hold off a general price increase for two months to accommodate for more of the losses associated. However, those credits for a total sum of $85.000 were later unilaterally reversed by RLD and even if they had not been reversed, they would not have been sufficient to compensate Adventuremobile for the damages it has incurred.  For example, the

/ / /

4866-9657-1948.2

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

following damages would not have been compensated for (even if RLD had not reneged on its agreement to reimburse Adventuremobile in the sum of $85,000):

(a)  Claims that Adventuremobile initiated with freight companies wherein the companies immediately rejected the claims because they deemed the packaging by RLD to be insufficient and/or inadequate;

(b)  Dozens of partial refunds by Adventuremobile to direct customers and dealers to make them whole after receiving items that were damaged but salvageable;

(c)  having to re-crate products at Adventuremobile's expense, and/or place crates on custom-made pallets prior to shipping because the crates from the factory were insufficient;

(d)  Disposal costs for damaged and irrecoverable items;

(e)  The immense amount of additional labor and management hours involved in;

(f)  Managing the fallout (of all of defective shipping containers and defective products) with customers and dealers;

(g)  Many additional hours to unload containers by hand (inside damaged crates that were stuck or crushed into each other);

(h)  Numerous hours to manage additional operations in the warehouse, including altered storage systems to accommodate partially destroyed crates, as well as crates in general that could not be stored as normal due to damage risk;

(i)  Numerous hours spent fixing or repairing damaged items that were salvageable.

13.     In or about November 2021, RLD unilaterally decided to reverse those credits, held Adventuremobile hostage, and deviated from the agreement in demanding that the entire account (adding all the reversed credit charges) be brought current before anything else gets shipped.  RLD's wrongful acts caused tremendous problems for Adventuremobile in more ways than one.  The most significant one is cash flow as the items that have been ordered from South Africa and RLD refused to ship were already sold to the United States customers.

14.     In addition, there are a whole slew of other issues that have resulted from negligence at RLD factory, including, but not limited to: (1) Missing hardware and pieces; (2)

4866-9657-1948.2

**COMPLAINT FOR DAMAGES**

ROPERS MAJESKI
A Professional Corporation
Los Angeles

significant losses resulting from mislabeled product crates or packages; (3) incorrectly designed products that did not fit properly - some salvageable with a few hours of work, some entirely unusable; (4) improperly designed accessories that did not fit or work together as described or promised; (5) misrepresentations by RLD about order readiness and production schedules; (6) lack of response or insufficient response to warranty claims directly resulting from defects in RLD products that Adventuremobile has had to resolve on its end; and (7) numerous hours upon hours spent on investigating payment and invoicing issues that have arisen from RLD's own accounting problems.

15.   RLD is no longer standing behind its products and is not complying with the terms of the Distribution Agreement regarding RLD's defective products and RLD's warranty obligations.

16.   Adventuremobile has expended tens of thousands of dollars in repairs or replacement of items, paying additional freight, reimbursing customers for issues ranging from powder coat failures, missing hardware and pieces, improperly labeled crates, incorrect packing lists, damage due to improper packing, incorrect design/incompatibility of products, lack of quality control and shipment to Adventuremobile of incorrectly manufactured products and other similar issues.

17.   Adventuremobile has repeatedly demanded that RLD step up and acknowledge its liability for these issues and adequately resolve them.  However, RLD has failed to do so and has failed to make any commitment to fully reimburse Adventuremobile for fixing the numerous issues and problems that have arisen.

18.   Adventuremobile estimates losses in 2021 and 2022 due to these issues (and others stemming from failures at the RLD factory) to be in excess of $250,000. This is in addition to the immense losses resulting from the unsound decision to switch to particle board crating (of which Adventuremobile was not previously notified).

19.   In February 2022, Adventuremobile  requested in writing that the parties mediate or arbitrate their disputes as called for in Clause 17, paragraphs 2-3 of the Exclusive Distribution Agreement.  However, RLD flatly rejected Adventuremobile's request.

4866-9657-1948.2

**COMPLAINT FOR DAMAGES**

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

**GENERAL ALLEGATIONS**

20.     Plaintiff Adventuremobile is a company that sells canopies, awnings and camper shells to outfit pickup trucks for outdoor activities and adventures.

21.     Defendant RLD manufactures the canopies, awnings and camper shells that Adventuremobile sells in the United States.

22.     According to RLD's website, "We design and build for ergonomics and aesthetics, combined with practicality and versatility.  Our canopies are built with modern methods and materials to make the ultimate canopy for modern vehicles.  All of our components are laser cut and multi-axis CNC bent to 3D CAD models, TIG welded to ensure quality, and finished off with a heavy, textured powder coat for long-lasting, rugged durability."

23.     RLD's website also boasts about a two (2) year guarantee, stating that "We offer the longest warranty in the industry: every RLD Design canopy comes with a 2-year guarantee against defects and failures. You can work hard and sleep well knowing you have the best canopy in world and the support to help with any issues you may encounter."

24.     On March 19, 2021, Adventuremobile and RLD entered into an Exclusive Distributorship Agreement on March 19, 2021.  See **Exhibit A**.

25.     Pursuant to the terms of the EDA, Adventuremobile is the Exclusive Distributor for RLD products in North America, including but not limited to the United States, Canada, and Mexico. (See Exhibit A at Clauses 1.14 and 3.1)

26.     Pursuant to the terms of the EDA, Adventuremobile is entitled to a preferential purchase price of RLD products. (see Exhibit A at Clause 3.3)

27.     The EDA is a three-year agreement, set to automatically renew for successive two-year terms, unless either party notifies the other in writing of intent not to renew at least thirty (30) days prior to the end of the current term. (See Exhibit A at Clause 4.1)

28.     Clause 5 of the EDA contains the agreement between Adventuremobile and RLD regarding the Sale of Products. Pursuant to Clause 5.2,

/ / /

/ / /

"An Order may be placed by e-mail by sending a duly signed purchase order, signed on behalf of the Distributor by an authorized signatory, which purchase order shall be deemed to be an original document for all purposes." (See Exhibit A at Clause 5.2)

Pursuant to Clause 5.3,

> No Order shall be binding on the Company unless and until the Company notifies the Distributor, in writing, of its acceptance of the Order, which notification of acceptance may be delivered to the Distributor by e-mail.  In such acceptance, the Company shall confirm a delivery date as a date for Delivery ("Acknowledged Delivery Date").

(See Exhibit A at Clause 5.3)

29.     The EDA contains a procedure for Adventuremobile to inspect Products purchased from RLD at Clause 5.6 as follows:

> The Distributor and/or a duly authorized employee and/or agent shall inspect and accept the Products on behalf of the Distributor on delivery and shall accordingly sign a delivery note in confirmation of the acceptance of the Delivery of the Products in good order and quality, which shall be sent to Company by e-mail within 24 (twenty-four) hours from receipt of the goods. Shipments are confirmed with signed bill of lading, if any discrepancies occur according to the finalized confirmed order, Company will correct the discrepancy on the next order with a 30% discount clause on a confirmed negligence.  This discount will account for only the addressed incident and not for the whole shipment., I., one Tacoma canopy not loaded, but aa F150 instead as per order. 30% discount will be allowed on the next order of the first Tacoma canopy of the same model.

(See Exhibit A at Clause 5.6)

30.  Pursuant to Clause 5.8 of the EDA, "Each Order for the Products shall constitute a separate contract, and any default by the Company in relation to any one order shall not entitle the Distributor to treat this Agreement as terminated."

31.     Pursuant to Clause 10.4 of the EDA, RLD agreed that "The Company is responsible to ensure that all Products supplied to the Distributor meets the standards as set out in the industry, with all applicable quality, safety and other pertinent standards." (see Exhibit A at clause 10.4)

/ / /

4866-9657-1948.2

**COMPLAINT FOR DAMAGES**

ROPERS MAJESKI

A Professional Corporation
Los Angeles

32.     Pursuant to Clause 10.9 of the EDA, RLD agreed that "The Company shall not circumvent, avoid, bypass, or obviate, directly or indirectly, the intent of this Agreement to maintain Distributor as the sole and exclusive distributor in the Territory during the Term of this Agreement." (See Exhibit A at Clause10.9)

33.     Pursuant to Clause 12.4 of the EDA, RLD agreed that

> Notwithstanding the provisions of clause 12.3 herein above, the Company's liability in respect of the supply of defective Product will be:
> 12.4.1 the replacement of such defective Product; or
> 12.4.2 the refund to the Distributor of the cost at which the Distributor purchased such defective Product;
> 12.4.3 The Company offers a limited warranty of 2 (two) years for the components of each individual product, which warranty excludes fair wear and tear and/or misuse of the Product.

(Exhibit A at Claus 12.4.)

34.     On December 14, 2020, Adventuremobile placed an Order with RLD pursuant to the terms of the EDA. RLD acknowledged the Order, which was shipped to Adventuremobile and received on or about June 6, 2021. Upon receipt of the Order, Adventuremobile noted that there was an unexpected change to the shipping crate design and upon inspecting the shipment, it was discovered that many of the Products were badly damaged during shipment due to the improperly designed and constructed shipping crates. Pursuant to the terms of the EDA, Adventuremobile promptly advised RLD of the problems with the Order in a live WhatsApp conversation with RLD's representatives, Mr. Grabe (former CEO) and Riaan Ludik (the owner).

35.     In response to being alerted to the damaged/defective Products received by Adventuremobile, RLD offered a credit of $8,500 on future orders, and promised shipment of replacement Products for the damaged/defective Order.

36.     In the weeks and months that followed, RLD shipped numerous additional damaged/defective Orders to Adventuremobile, and refused to honor the EDA Clause 12.3-12.4.3 with regard to replacement of defective Products and refunding Adventuremobile for the cost at which it purchased the defective/damaged Products.

/ / /

4866-9657-1948.2

**COMPLAINT FOR DAMAGES**

ROPERS | MAJESKI

A Professional Corporation
Los Angeles

37.     As an apparent retaliation for Adventuremobile alerting RLD to its shipping of defective and/or damaged Products for the Orders, RLD has refused to provide a production schedule, and also refused to respond to any additional warranty claims due to damages during shipping or defective manufacturing. Without any support from the factory (RLD), Adventuremobile was forced to discontinue placing new orders because doing so, would have driven Adventuremobile even deeper into debt and facing customer complaints for defective Products.  RLD's action and/or omissions have resulted in halting Adventuremobile's business operations as Adventuremobile does not have Products to sell to customers without RLD fulfilling Orders pursuant to the EDA.

38.     At all relevant times, Adventuremobile complied with all of its obligations and duties under the EDA even after RLD's repeated and continuous breaches of the EDA by shipping defective Products and/or using shipping containers which resulted in Products being damaged during transit.  For example, throughout a period of ten (10) months (June 2021 through April 2022), Adventuremobile complied with all of its obligations despite RLD's ongoing and continuous breaches.  In or about April 2022, RLD abruptly sent a notice of Termination of the Exclusive Distribution Agreement.

## FIRST CLAIM FOR RELIEF

### (Breach of Written Agreement- Exclusive Distributorship Agreement)

39.     Plaintiff Adventuremobile repeats, realleges and incorporates paragraphs 1 through 38 above as though fully set forth herein.

40.     As described above and confirmed by a review of the Exclusive Distributorship ("EDA") attached hereto as **Exhibit A**, Adventuremobile and RLD entered into a binding written contract on March 19, 2021.

41.     In accordance with the EDA, Adventuremobile placed Orders with RLD in or around May 2021.  In accordance with the EDA, RLD acknowledged the Orders placed by Adventuremobile, and then shipped damaged and/or defective Products to Adventuremobile.

/ / /

4866-9657-1948.2

**COMPLAINT FOR DAMAGES**

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

42.     In accordance with the EDA, Adventuremobile promptly advised RLD of the receipt of damaged and/or defective goods.

43.     RLD acknowledged receipt of the notice of damaged and/or defective goods, and offered a credit of $8,500 on Orders containing damaged and/or defective goods, and promised to immediately ship goods that were not damaged and/or defective pursuant to the EDA and specifically Clauses 12.4, 12.4.1, 12.4.2, and 12.4.3.

44.     Despite promising the $8,500 credit and to ship replacement goods to replace the damaged and/or defective Products, RLD failed to do so.

45.     In the months that followed, RLD rescinded the $8,500 credits that were initially extended to remedy its shipment of damaged and/or defective goods.

46.     Adventuremobile has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the EDA, except potentially for those excused by RLD's non-performance of its obligations.

47.     RLD has breached the EDA by failing to perform with respect to its shipping of defective and/or damaged Products to Adventuremobile, and failing to comply with the obligations imposed on RLD pursuant to the EDA pursuant to Clauses 12.4, 12.4.1, 12.4.2, and 12.4.3.

48.     Adventuremobile has been damaged and suffered harm as a result of RLD's breach of the EDA in amounts far exceeding $75,000.

49.     Adventuremobile continues to be damaged on an ongoing basis as a result of RLD's ongoing breach of the EDA, including but not limited to damage to its reputation and ability to market Products for sale.

## SECOND CLAIM FOR RELIEF

**(Subsequent and Continuous Breaches of Written Agreements - Exclusive Distributorship Agreement, Purchase Orders and Invoices Placed Pursuant to Exclusive Distribution Agreement )**

50.     Plaintiff Adventuremobile repeats, realleges and incorporates paragraphs 1 through 49 above as though fully set forth herein.

4866-9657-1948.2

**COMPLAINT FOR DAMAGES**

A Professional Corporation
Los Angeles

ROPERS
MAJESKI

51.     As described and explained above, Plaintiff Adventuremobile and Defendant RLD entered into an Exclusive Distribution Agreement on or about March 19, 2021.  See **Exhibit A**. Therefore, a valid and enforceable contract exists between Plaintiff Adventuremobile and Defendant RLD.

52.     Moreover, in addition to the EDA, pursuant to Clause 5.8 of the EDA, "***Each Order for the Products shall constitute a separate contract***, and any default by the Company in relation to any one order shall not entitle the Distributor to treat this Agreement as terminated." (Exhibit A, Clause 5.8) (emphasis added).

53.     Additionally, each invoice corresponding to each Order, includes RLD's warranty obligations as follows:

> **WARRANTY**
> 5.1 RLD Design warrants that all products will perform in terms of the specification provided by RLD and shall promptly provide replacements or corrections to any product which does not so perform in accordance with the granted warranties, which are set out as follows:
> 5.1.1 a 2 (two) year warranty for the structural integrity on all products;
> 5.1.2 a 1 (one) year warranty on the coating of all products on both a coastal and inland basis;
> 5.1.3 a 1 (one) year warranty on all struts, hinges, and locks.
> 5.2 The warranty only covers defects or errors which were present at the time of purchase or which arise due to the normal use of the products. The warranty will not cover any defects to products which occur as a result of the improper use, use other than for the intended purpose, inadequate maintenance, or damage caused either willfully or negligently by the Customer or a third party.
> 5.3 Any products couriered to the Customer exclude a warranty for any problems relating to the fitting or leaking of the Products.
> 5.4 All warranties are only serviceable at RLD Design factory, situated in Pretoria.  (See Exhibit B, a sample invoice)

54.     As described and explained above, RLD's continues and ongoing breach of the EDA as well as breach of several Orders and corresponding invoices began in early June 2021.

55.     Since Adventuremobile initially alerted RLD to its shipment of defective and/or damaged goods in June 2021, RLD has continuously shipped defective and/or damaged goods to Adventuremobile.  Each time RLD has shipped defective and/or damaged goods to Adventure-

/ / /

4866-9657-1948.2

**COMPLAINT FOR DAMAGES**

mobile, Adventuremobile has promptly alerted RLD to the defective and/or damaged goods received pursuant to the terms of the EDA and Orders.

56.     RLD has refused to honor its limited warranty and express terms of the EDA, specifically Clauses 12.4, 12.4.1, 12.4.2, and 12.4.3 as well as the relevant provisions of the Orders and invoices.

57.     As of the date of the filing of this Complaint, RLD has sent at least twenty (20) shipments of damaged and/or defective Products to Adventuremobile, and has refused to comply with Clauses 12.4, 12.4.1, 12.4.2, and 12.4.3 of the EDA and corresponding Orders and invoices regarding damaged and/or defective goods.

58.     As of the date of the filing of this Complaint, Adventuremobile has more than thirty (30) open warranty claims for damaged and/or defective goods that were shipped by RLD. RLD has refused to honor Clauses 12.4, 12.4.1, 12.4.2, and 12.4.3 of the EDA for these open warranty claims.

59.     RLD's refusal to honor Clauses 12.4, 12.4.1, 12.4.2, and 12.4.3 of the EDA as well as the relevant provisions of the Orders and invoices with regard to the open warranty claims described above amounts to separate breaches for each and every shipment of defective and/or damaged goods.

60.     Adventuremobile has been harmed and suffered damage as a result of RLD's refusal to honor Clauses 12.4, 12.4.1, 12.4.2, and 12.4.3 of the EDA and ongoing breaches of the EDA and Orders and invoices with regard to these open warranty claims, as Adventuremobile paid a deposit to RLD in connection with each and all invoices wherein RLD shipped defective and/or damaged goods, and Adventuremobile has been unable to obtain payment from its customers for the defective and/or damaged goods that RLD has refused to replace or issue a refund.

61.     Adventuremobile has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the EDA, Orders and invoices, except potentially for those excused by RLD's non-performance of its obligations.

/ / /

4866-9657-1948.2

- 13 -

**COMPLAINT FOR DAMAGES**

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

## THIRD CLAIM FOR RELIEF

### (Breach of Duty of Good Faith and Fair Dealing)

62.     Plaintiff Adventuremobile repeats, realleges and incorporates paragraphs 1 through 61 above as though fully set forth herein.

63.     As described and explained above, Plaintiff Adventuremobile and Defendant RLD entered into an Exclusive Distribution Agreement on March 19, 2021.  See **Exhibit A**.  Therefore, a valid and enforceable contract exists between Plaintiff Adventuremobile and Defendant RLD.

64.     Adventuremobile has conducted itself in a manner that is faithful to the purpose of the EDA, and has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the EDA, except potentially for those excused by RLD's non-performance of its obligations.

65.     To the contrary, RLD has refused to honor its contractual obligations pursuant to the EDA, specifically with regard to Clauses 12.4, 12.4.1, 12.4.2, and 12.4.3.

66.     In refusing to honor its contractual obligations, RLD has acted in a manner that is unfaithful to the purpose of the contract.

67.     Adventuremobile's justified expectations were that RLD would honor its contractual obligations, and honor its warranty and specifically Clauses 12.4, 12.4.1, 12.4.2, and 12.4.3 of the EDA.

68.     RLD's refusal to honor its contractual obligations as described herein resulted in Adventuremobile's justified expectations pursuant to the EDA to be denied, and therefore RLD has breached its duty of good faith and fair dealing.

69.     Adventuremobile alleges on information and belief that RLD's refusal to honor its contractual obligations has been intentional with the motivation being to sabotage Adventuremobile's business prospects in the United States so that RLD could select a different exclusive distributor to sell its Products in the United States in direct contravention of the purpose of the EDA.

70.     Adventuremobile has been harmed and damaged, and continues to be harmed and damaged by RLD's breach of the duty of good faith and fair dealing, insofar as Adventuremobile

4866-9657-1948.2

**COMPLAINT FOR DAMAGES**

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

has been left to deal with customers that received damaged and/or defective Products from RLD and RLD has refused to honor its contractual obligations pursuant to the EDA and limited warranty, including but not limited to Clauses 12.4, 12.4.1, 12.4.2, and 12.4.3. of the EDA.

71.   As a direct and proximate result of actions and/or omissions to act of Defendant, Plaintiff has been compelled to incur attorney's fees, court costs, and the expenses of this action, and may in the future be compelled to incur additional expenses and fees.  Plaintiff will seek leave of court to amend this Complaint to set forth the amount of said damages when they have been ascertained, if any.

72.   As RLD's intentional conduct was willful and malicious, Plaintiff Adventuremobile seeks exemplary and punitive damages in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF

### (Intentional Interference with Existing Contractual Relations)

73.   Plaintiff Adventuremobile repeats, realleges and incorporates paragraphs 1 through 72 above as though fully set forth herein.

74.   Defendant RLD intentionally interfered with Plaintiff Adventuremobile's existing contractual relationships, insofar as RLD refused to honor its express contractual warranty after shipping defective and/or damaged goods to Adventuremobile.  Further, RLD made disparaging remarks about Adventuremobile in writing to Adventuremobile's dealers and customers.  For example, RLD made the following disparaging remarks about Adventuremobile in writing:

> The delays have regrettably been beyond the control of RLD Design (Pty) Ltd, as the delays in the supply and delivery of the products from our side ***have been occasioned by a failure by Adventuremobile Inc to pay RLD Design (Pty) Ltd the deposits required*** to enable RLD Design (Pty) Ltd to commence with the production of the relevant products, despite demands therefore.

See Exhibit C.

75.   Defendant RLD was aware of Plaintiff Adventuremobile's existing contractual relationships with its dealers and customers, as RLD knew that Adventuremobile would place Orders for its customers once a purchase contract had been executed.  RLD was and has been

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

1  aware that making disparaging remarks about Adventuremobile will interfere in

2  Adventuremobile's contractual relations with its dealers and customers and will injure

3  Adventuremobile's business reputation and will result in loss of business.

4      76.    RLD intentionally failed to honor its express contractual warranty with the

5  knowledge that Adventuremobile's relationship with its existing customers would be damaged by

6  RLD's tortious refusal to honor its contractual warranty and by making disparaging remarks

7  about Adventuremobile.

8      77.    Adventuremobile's existing contractual relationships have been damaged as a

9  result of RLD's refusal to honor its express warranty, intentional tortious interference with

10  Adventuremobile's contractual relationships, and by making disparaging remarks about

11  Adventuremobile.

12      78.    RLD's intentional interference with Adventuremobile's existing contractual

13  relationships (including making disparaging remarks about Adventuremobile) has resulted in

14  Adventuremobile being unable to honor its contractual duties to its dealers and customers, or in

15  other words, RLD forced Adventuremobile to breach its contracts with its existing customers and

16  has resulted in loss of business reputation.

17      79.    RLD's tortious interference with Adventuremobile's existing contractual

18  relationships (including RLD's disparaging remarks about Adventuremobile) was done

19  intentionally to thwart Adventuremobile's business operations in the United States and North

20  America.  RLD's intentional interference with Adventuremobile's business operations and

21  contractual relationships was, and has been, malicious in nature, and oppressive insofar as RLD

22  intentionally harmed Adventuremobile's business operations and reputation. See Exhibit C where

23  RLD invites Adventuremobile's dealers and customers to contact RLD directly:

24          we are now able to arrange or facilitate the supply of the products directly to
            you or to make alternative arrangements to ensure the supply of Products via
25          an alternative distributor in North America. Should you be desirous of
            ordering products, we request that you please visit our website
26          https://rlddesign.co.za/ to view our product offering and to contact us for a
            quote. We assure you that we will spare no effort or expense in bringing the
27          production and supply of the products back up to speed.

28

4866-9657-1948.2

**COMPLAINT FOR DAMAGES**

80.     Plaintiff Adventuremobile has suffered financial and reputational harm as a result of RLD's intentional interference with its existing contracts in an amount to be proven at trial.

81.     As a direct and proximate result of actions and/or omissions to act of Defendant, Plaintiff has been compelled to incur attorney's fees, court costs, and the expenses of this action, and may in the future be compelled to incur additional expenses and fees.  Plaintiff will seek leave of court to amend this Complaint to set forth the amount of said damages when they have been ascertained, if any.

82.     As RLD's intentional conduct was willful and malicious, Plaintiff Adventuremobile seeks exemplary and punitive damages in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF

### (Negligent Interference with Existing Contractual Relations)

83.     Plaintiff Adventuremobile repeats, realleges and incorporates paragraphs 1 through 82 above as though fully set forth herein.

84.     By nature of the EDA between RLD and Adventuremobile, RLD was aware that Adventuremobile would be entering contracts with customers in the territory (*i.e.*, North America) and that Adventuremobile would be relying on RLD to provide Products pursuant to the EDA that were free from defects and/or damage, and also in honoring its express contractual warranty.  Further, RLD made disparaging remarks about Adventuremobile in writing to Adventuremobile's dealers and customers.

85.     RLD knew that Adventuremobile would be in breach of contracts with its customers in the territory (*i.e.*, North America) if RLD shipped damaged and/or defective Products and failed to honor its express contractual warranty regarding goods sold pursuant to the EDA.  RLD was and has been aware that making disparaging remarks about Adventuremobile will interfere in Adventuremobile's contractual relations with its dealers and customers and will injure Adventuremobile's business reputation and will result in loss of business.

86.     With knowledge that Adventuremobile would not be able to honor its contracts with customers in the territory (*i.e.*, North America) if it shipped damaged and/or defective goods, Defendant RLD shipped countless shipments of damaged and/or defective goods to

4866-9657-1948.2

**COMPLAINT FOR DAMAGES**

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

Adventuremobile, even after being put on notice that the goods being shipped were defective and/or damaged. Further, RLD made disparaging remarks about Adventuremobile to Adventuremobile's dealers and customers.

87.    Defendant RLD knew or should have known that shipping damaged and/or defective goods to Adventuremobile would disrupt Adventuremobile's business operations and result in Adventuremobile being unable to honor its contractual duties to its customers.  Further, RLD knew or should have known that making disparaging remarks about Adventuremobile would damage Adventuremobile's business reputation and would result in loss of business to Adventuremobile.

88.    Defendant RLD failed to use reasonable care to ensure that it did not interfere with Adventuremobile's contractual relationships with its dealers and customers, and continued to ship damaged and/or defective goods to Adventuremobile knowing that it would result in Adventuremobile being unable to honor its contractual relationships with its customers in the territory (*i.e.,* North America).  Further, RLD failed to use reasonable care to ensure that it did not interfere with Adventuremobile's contractual relationships with its dealers and customers and made disparaging remarks about Adventuremobile knowing that it would result in inuring Adventuremobile's business reputation and loss of business.

89.    As a result of RLD's negligent interference with Adventuremobile's existing contracts, Adventuremobile has suffered a loss of income and harm to its reputation in an amount to be proven at the time of trial.

90.    As a direct and proximate result of actions and/or omissions to act of Defendant, Plaintiff has been compelled to incur attorney's fees, court costs, and the expenses of this action, and may in the future be compelled to incur additional expenses and fees.  Plaintiff will seek leave of court to amend this Complaint to set forth the amount of said damages when they have been ascertained, if any.

/ / /

/ / /

/ / /

4866-9657-1948.2

**COMPLAINT FOR DAMAGES**

1

## SIXTH CLAIM FOR RELIEF

2

### (Intentional Interference with Prospective Economic Advantage)

3       91.     Plaintiff Adventuremobile repeats, realleges and incorporates paragraphs 1 through

4   90 above as though fully set forth herein.

5       92.     Defendant RLD was aware that Plaintiff Adventuremobile was entering contracts

6   with customers in the territory (*i.e.,* North America), and that Adventuremobile was aggressively

7   marketing RLD's Products in the territory to secure future contracts with customers.

8       93.     Defendant RLD knew that if Plaintiff Adventuremobile was unable to provide

9   goods pursuant to the EDA to its customers in the territory (*i.e.,* North America) that

10   Adventuremobile would be unable to honor its existing contracts, as well as future contractual

11   relationships.

12       94.     Defendant RLD intended to cause Adventuremobile to suffer business losses by

13   shipping defective and/or damaged goods to Adventuremobile pursuant to the EDA, and by

14   intentionally failing to honor its express contractual warranty.

15       95.     Adventuremobile alleges that RLD intentionally shipped damaged and/or defective

16   goods, and failed to honor its express contractual warranties to intentionally stifle

17   Adventuremobile's business and marketing efforts in the territory (*i.e.,* North America) so that

18   RLD could cancel the exclusive distributorship with Adventuremobile.

19       96.     RLD did not have any privilege or justification for its intentional interference with

20   Adventuremobile's prospective business relationships.

21       97.     As a direct and foreseeable result of RLD's tortious and intentional conduct,

22   Adventuremobile has suffered reputational damage and the loss of prospective business in an

23   amount to be proven at trial.

24       98.     As a direct and proximate result of actions and/or omissions to act of Defendant,

25   Plaintiff has been compelled to incur attorney's fees, court costs, and the expenses of this action,

26   and may in the future be compelled to incur additional expenses and fees.  Plaintiff will seek

27   leave of court to amend this Complaint to set forth the amount of said damages when they have

28   been ascertained, if any.

4866-9657-1948.2

**COMPLAINT FOR DAMAGES**

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

99.     RLD's efforts to stifle and thwart Adventuremobile's prospective business relationships were malicious and oppressive, and done intentionally to cause economic harm to Plaintiff, and therefore Adventuremobile seeks exemplary and punitive damages at trial.

**SEVENTH CLAIM FOR RELIEF**

**(Unjust Enrichment)**

100.     Plaintiff repeats, realleges and incorporates paragraphs 1 through 99 as though fully set herein.

101.     As described and explained above, Plaintiff Adventuremobile and Defendant RLD entered into an Exclusive Distribution Agreement ("EDA") on March 19, 2021.  A true and correct cop of the EDA is attached hereto as **Exhibit A**. Therefore, a valid and enforceable contract exists between Plaintiff Adventuremobile and Defendant RLD.

102.     Pursuant to the terms of the EDA, specifically Clause 5.4, Adventuremobile was required to make a payment of 70% of the requested Order quantity for each order it submitted to RLD.  Per the terms of the EDA and Clause 5.4, this was deemed a prerequisite to the acceptance of Orders by RLD.

103.     Adventuremobile complied with the EDA and Clause 5.4, and made payments of 70% of Order quantities for each Order submitted to RLD.

104.     RLD then shipped damaged and/or defective goods to Adventuremobile, and refused to honor the terms of the EDA, specifically Clauses 12.4, 12.4.1, 12.4.2, and 12.4.3.

105.     The 70% prepayment to RLD by Adventuremobile amounts to a benefit being conferred on RLD by Adventuremobile.

106.     The benefit of the 70% prepayment to RLD by Adventuremobile is a benefit that was enjoyed by RLD.

107.     RLD accepted the 70% prepayment by Adventuremobile, and has retained these monies paid while also refusing to honor RLD's contractual obligations specifically Clauses 12.4, 12.4.1, 12.4.2, and 12.4.3 of the EDA.

108.     As RLD has refused to honor its contractual obligations related to its shipment of damaged and/or defective goods to Adventuremobile, it would be inequitable to permit RLD to

- 20 -

**COMPLAINT FOR DAMAGES**

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

1    retain the benefit of Adventuremobile's prepayments totaling 70% of each Order for defective

2    and/or damaged goods from RLD.

3         109.    Permitting RLD to retain these monies would violate the fundamental principles of

4    justice or equity in good conscience.

5         110.    Therefore, RLD has been unjustly enriched to the detriment of Adventuremobile,

6    and RLD must be required to return all prepayments made by Adventuremobile for defective

7    and/or damaged goods shipped by RLD.

8         111.    Adventuremobile alleges that RLD has been unjustly enriched in amounts in

9    excess of $200,000 for retaining prepayment amounts for goods that were not delivered in

10   compliance with the EDA.

## EIGHTH CLAIM FOR RELIEF

### (Defamation)

13        112.    Plaintiff repeats, realleges and incorporates paragraphs 1 through 111 as though

14   fully set herein.

15        113.    In or about August 2022, Plaintiff discovered that RLD has made disparaging

16   remarks about Adventuremobile, in writing, to Adventuremobile's dealers and customers.

17   Defendant RLD fabricated those charges in an attempt to defame Plaintiff. Defendant RLD

18   accused Plaintiff of dishonesty in dealing with its dealers and customers.  See Exhibit C.

19        114.    The statements (*i.e.,* the disparaging remarks) made by RLD about

20   Adventuremobile were false and unprivileged at the time they were made.

21        115.    RLD's statements (*i.e.,* disparaging remarks) were published to persons and

22   entities other than Plaintiff, *e.g.,* Adventuremobile's dealers and customers.

23        116.    Defendant RLD's statements (*i.e.,* disparaging remarks) injured

24   Adventuremobile's reputation in that the disparaging remarks cast doubt on Adventuremobile's

25   honesty in dealing with its dealers and customers.

26        117.    As a proximate result of Defendant RLD's defamation of Plaintiff, Plaintiff has

27   suffered and continues to suffer substantial losses to it business reputation, loss of business and

28   income.

ROPERS
MAJESKI
A Professional Corporation
Los Angeles

4866-9657-1948.2

**COMPLAINT FOR DAMAGES**

118.    Defendant RLD committed the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to despicable conduct, and in conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to recover punitive damages from Defendant RLD in an amount according to proof.

**NINTH CLAIM FOR RELIEF**

**(Injunctive Relief)**

119.    Plaintiff repeats, realleges and incorporates paragraphs 1 through 118 as though fully set herein.

120.    As described and explained above, Plaintiff Adventuremobile and Defendant RLD entered into an Exclusive Distribution Agreement on or about March 19, 2021.  See **Exhibit A**. Therefore, a valid and enforceable contract exists between Plaintiff Adventuremobile and Defendant RLD.

121.    Pursuant to the terms of the EDA Clauses 1.14 and 3, et. Seq., RLD appointed Adventuremobile to be its exclusive distributor for goods in the North America, including but not limited to the United States, Canada, and Mexico.

122.    As described and explained herein, RLD breached the EDA by shipping damaged and/or defective goods and refusing to honor its own warranty, specifically Clauses 12.4, 12.4.1, 12.4.2, and 12.4.3. of the EDA.

123.    On or about May 11, 2022, RLD sent Adventuremobile a letter purportedly terminating the distribution agreement.

124.    Adventuremobile therefore seeks an injunction precluding RLD from terminating the EDA, and from appointing another distributor as its exclusive distributor in North America.

125.    Adventuremobile has demonstrated, and can demonstrate a reasonable probability of success on the merits of the claims contained herein.

126.    If an injunction is not issued, Adventuremobile will suffer irreparable harm, insofar as it be stripped of its exclusive distributorship rights under the EDA.

/ / /

/ / /

4866-9657-1948.2

**COMPLAINT FOR DAMAGES**

127.    An injunction is appropriate in light of the relative hardships of the parties and the public's interest in stopping RLD's unlawful behavior in the State of Nevada, the United States, and North America.

128.    The injunction sought by Adventuremobile is to preserve or restore the status quo, and to put Adventuremobile in the condition and position it would be in had RLD complied with the terms of the EDA and had RLD's unlawful conduct had not necessitated the filing of this lawsuit or request for injunction.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1.      For actual, compensatory, and consequential damages in the amount of no less than $350,000.00;

2.      For exemplary and punitive damages in an amount to be proven at trial; and

3.      For pre-judgment and post-judgment interest at the maximum rate allowed by law;

4.      For an order awarding to Plaintiff all of its attorneys' fees incurred in prosecuting this action;

5.      For Plaintiffs' costs of suit incurred herein;

6.      For an injunction prohibiting RLD from appointing another company as its exclusive distributor in the United States and North America; and

7.      For such further and other relief as this Court deems just and proper under the circumstances.

4866-9657-1948.2

**COMPLAINT FOR DAMAGES**

A Professional Corporation
Los Angeles

ROPERS
MAJESKI

1

Dated:  August 16, 2022

2

ROPERS MAJESKI PC

3

By: _____

4

STEPHEN J. ERIGERO
(NV BAR NO. 11562)

5

ROPERS MAJESKI PC
3753 Howard Hughes Parkway, Suite 200

6

LAS VEGAS, NEVADA 89169
Phone:    (702) 954-8300

7

Facsimile: (213) 312-2001
Email: stephen.erigero@ropers.com

8

Attorneys for Plaintiff

9

ADVENTUREMOBILE INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4866-9657-1948.2

**COMPLAINT FOR DAMAGES**

1

## **DEMAND FOR JURY TRIAL**

2      Plaintiff Adventuremobile Inc. hereby demands trial by jury in this action.

3

4   Dated:  August 16, 2022                            ROPERS MAJESKI PC

5

6                                                      By:
                                                       STEPHEN J. ERIGERO
7                                                      (NV BAR NO. 11562)
                                                       ROPERS MAJESKI PC
8                                                      3753 Howard Hughes Parkway, Suite 200
                                                       LAS VEGAS, NEVADA 89169
9                                                      Phone:    (702) 954-8300
                                                       Facsimile: (213) 312-2001
10                                                     Email: stephen.erigero@ropers.com

11                                                     Attorneys for Plaintiff
                                                       ADVENTUREMOBILE INC.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4866-9657-1948.2

**COMPLAINT FOR DAMAGES**

# EXHIBIT A
# To Complaint

**Exclusive Distribution Agreement between RLD and Adventuremobile**

# EXCLUSIVE DISTRIBUTION AGREEMENT

| 1. The Company | **RLD DESIGN (PTY) LTD** |
|---|---|
| | (hereinafter referred to as the "Company") |
| 2. Registration Number | 2015/298636/07 |
| 3. Country of Incorporation | Republic of South Africa |
| 4. VAT Number | N.A. |
| 5. Represented by | Riaan Ludik |
| 6. Designation | Director |
| 7. With Identity Number | |
| 8. Telephone Number | N.A. |
| 9. Fax Number | N.A. |
| 10. Email Address | riaan@rlddesign.co.za |
| 11. Physical Address | |
| 12. Postal Address | |
| 13. *Domicilium* Physical Address | |
| 14. *Domicilium* E-mail Address | riaan@rlddesign.co.za |

THIS EXCLUSIVE DISTRIBUTION AGREEMENT is entered into by and between:

| 15. The Distributor | **ADVENTUREMOBILE INC.** |
|---|---|
| | (hereinafter referred to as "the Distributor") |
| 16. Registration Number | E0015142019-8 |
| 17. Country of Incorporation | State of Nevada, USA |
| 18. VAT Number (if applicable) | |
| 19. Represented by | Thomas Corwin Hession-Herzog |
| 20. Designation | President |
| 21. With Identity/Passport Number | |



| 22. Telephone Number | (206) 406-7684 |
|---|---|
| 23. Fax Number | |
| 24. Email Address | mail@adventuremobile.us |
| 25. Physical Address | 4021 13th Ave W |
| 26. Postal Address | Seattle, Washington 98119 |
| 27. *Domicilium* Physical Address | |
| 28. *Domicilium* E-mail Address | |

and

(Hereinafter the Company and the Distributor shall be referred to as the "Parties")



**INDEX**

| 1. | INTERPRETATION | 3 |
|----|----------------|---|
| 2. | INTRODUCTION | 4 |
| 3. | APPOINTMENT | 5 |
| 4. | TERM | 5 |
| 5. | SALE OF PRODUCTS | 5 |
| 6. | PRICE | 6 |
| 7. | PAYMENT TERMS | 6 |
| 8. | RISK AND OWNERSHIP | 7 |
| 9. | DUTIES OF THE DISTRIBUTOR | 7 |
| 10. | DUTIES OF THE COMPANY | 9 |
| 11. | RESERVED RIGHTS OF THE COMPANY | 10 |
| 12. | LIMITED WARRANTY | 11 |
| 13. | LIMITED LIABILITY | 12 |
| 14. | INTELLECTUAL PROPERTY | 12 |
| 15. | CONFIDENTIALITY | 12 |
| 16. | TERMINATION | 13 |
| 17. | DISPUTE RESOLUTION | 14 |
| 18. | GOVERNING LAW AND JURISDICTION | 16 |
| 19. | RELATIONSHIP | 16 |
| 20. | RESTRAINT | 16 |
| 21. | SEVERABILITY | 17 |
| 22. | WHOLE AGREEMENT | 17 |
| 23. | NO VARIATION | 17 |
| 24. | SUPERSESSION | 17 |
| 25. | RELAXATION | 17 |
| 26. | WAIVER | 17 |
| 27. | NO CESSION OR ASSIGNMENT | 17 |
| 28. | FORCE MAJEURE | 18 |
| 29. | NOTICES AND DOMICILIA | 18 |
| 30. | GOOD FAITH | 19 |
| 31. | COMPLIANCE & CORRUPT PRACTICES | 19 |
| 32. | CONFLICT | 20 |



**1.**   **INTERPRETATION**

1.      In this Agreement, unless the context otherwise indicates:

1.1.      "**AGREEMENT**" means this agreement between the Parties and all annexures thereto;

1.2.      "**THE COMPANY**" means the Company specified in Schedule 1 of this Agreement and who shall supply the Products to the Distributor;

1.3.      "**CONFIDENTIAL INFORMATION**" means:

1.3.1.      any information of whatever nature, which has been or may be obtained by either of the Parties from the other, whether in writing or in electronic form or pursuant to discussions between the Parties, or which can be obtained by examination, testing, visual inspection or analysis, including, without limitation, scientific, business or financial data, know-how, show-how, formulae, processes, designs, sketches, photographs, plans, drawings, packaging, specifications, sample reports, models, customer lists, price lists, studies, findings, software, software source documents, source codes, proprietary hardware, inventions or ideas;

1.3.2.      formulae of manufacturing and/or composition of the Product;

1.3.3.      analyses, concepts, compilations, studies and other material prepared by or in possession or control of the recipient which contain or otherwise reflect or are generated from any such information as is specified in this definition;

1.3.4.      any dispute between the Parties resulting from this Agreement and/or any and all information pertaining to such disputes;

1.4.      "**CUSTOMER**" means the purchaser or end-user of the Products in the Territory;

1.5.      "**DELIVERY**" means delivery of the Products by the Company to the Distributor at a delivery point as agreed upon by and between the Parties from time to time, upon which Delivery the Distributor will sign a Delivery Note;

1.6.      "**DELIVERY NOTE**" means a note and/or document in confirmation thereof that the Products have been received, in good order and quality, by the Distributor from the Company upon Delivery on the date of Delivery;

1.7.      "**THE DISTRIBUTOR**" means the company as specified in Schedule 1 of this Agreement as well as any of its subsidiaries and who shall purchase the Products from the Company and distribute the Products in the Territory;

1.8.      "**EFFECTIVE DATE**" means the Signature Date;



1.9.    "**ORDER(S)"** means any order for the Products placed on the Company by the Distributor, and accepted in writing by the Company in the manner provided for in this Agreement;

1.10.   "**PARTY/IES**" means the Company and/or the Distributor as the case may be;

1.11.   "**PRODUCT(S)"** means the products listed in Exhibit "A" hereto;

1.12.   "**PREMISES**" means 53 Kambathi Street, N4 Gateway Industrial Park, Willow Park Manor X65, Pretoria, 0184.

1.13.   "**SIGNATURE DATE"** means the date on which the last Party signs this Agreement;

1.14.   "**TERRITORY**" means the countries in the North American continent, including but not limited to the United States, Canada, and Mexico.

2.    Words importing the singular shall include the plural and *vice versa*; words importing any gender shall include the other genders and words importing persons shall include partnerships, private companies and bodies corporate.

3.    The head notes to the paragraphs to this Agreement are inserted for reference purposes only and shall not affect the interpretation of any of the provisions to which they relate.

4.    This Agreement includes all schedules and/or exhibits thereto which form an integral part of this Agreement.

5.    This Agreement shall be binding and enforceable by the trustees, permitted assigns, liquidators or other legal successors of the Parties as fully and effectually as if they had signed this Agreement in the first instance and reference to any Party shall be deemed to include such Party's trustees, permitted assigns, liquidators or other legal successors, as the case may be.

6.    Full effect shall be given to any substantive provision conferring rights and obligations upon the Parties and contained in clause 1 or clause 2 provided that if any provision in clause 2 conflicts with any other provision of this Agreement, such other provisions shall prevail and be carried into effect.

7.    Whenever a number of days are prescribed in this Agreement, such number shall be calculated excluding the first and including the last day, unless the last day is not a business day, in which event the last day shall be the next day which is a business day in the State of Nevada, United States of America.

8.    Whenever performance is required to be made in this Agreement on any date and such date is not a business day, such performance shall be required to be made on the next date, which is a business day in the State of Nevada, United States of America.

9.    Where any term is defined within the context of any particular clause in this Agreement, the term so defined shall, unless it appears clearly from the clause in question that such term has limited application to the relevant clause, bear the meaning ascribed for all purposes in terms of this Agreement, notwithstanding that such term has not been defined in this clause 1.

10.   The rule of construction that a contract shall be interpreted against the party responsible for the drafting or preparation of the contract, shall not apply.

2.      **INTRODUCTION**

2.1.    The Distributor wishes to be appointed as the exclusive distributor for the Products in the Territory.

2.2.    The Company wishes to appoint the Distributor as its exclusive distributor for the Products in the Territory.

3.      **APPOINTMENT**

3.1.    The Company hereby appoints the Distributor on an exclusive basis to purchase the Products for re-sale in the Territory subject to the terms and conditions of this Agreement.

3.2.    The Distributor hereby accepts such appointment and agrees to act in the capacity of distributor subject to the terms and conditions of this Agreement.

3.3.    The Distributor shall, in concluding this Agreement, be entitled to purchase the Products at the preferential purchase price as stipulated in Exhibit B.

3.4.    The Company shall be entitled in the event of termination of this Agreement, unless such termination results from Company's breach of this Agreement, to distribute the Products either directly or through other distributors and/or dealers and/or agents within the Territory.

3.5.    The Distributor shall act as an independent trader as regards the Company and the Customers.

3.6. The Distributor acknowledges that the Company wants to protect the brand and Products and therefore the Distributor may not appoint any other person, firm or company in the Territory as a distributor or agent for the Products in the Territory and may not sell any of the Products, which it purchases from the Company through a sales agent or to a sub-distributor without the express written consent of the Company, which shall not unreasonably be withheld.

3.7. Should the Distributor wish to appoint a subsidiary company to conduct or execute some of its obligations in terms of this Agreement, the Distributor shall first obtain the written consent of the Company, which consent shall not unreasonably be withheld.

4.      **TERM**

1.      This Agreement shall commence on the Effective Date and, subject to the provisions of this Agreement, shall continue in force from the Effective Date to the third anniversary of the Effective Date and shall be automatically renewed for successive two-year terms, unless either Party notifies the other in writing of the intent not to renew at least thirty (30) days prior to the end of the current term.

5.      **SALE OF PRODUCTS**

5.1.    The Company shall sell the Products to the Distributor in accordance with Orders placed by the Distributor and acceptance by the Company in the manner provided for in this Clause 5.



5.2.  An Order may be placed by e-mail by sending a duly signed purchase order, signed on behalf of the Distributor by an authorized signatory, which purchase order shall be deemed to be an original document for all purposes.

5.3.  No Order shall be binding on the Company unless and until the Company notifies the Distributor, in writing, of its acceptance of the Order, which notification of acceptance may be delivered to the Distributor by e-mail. In such acceptance, the Company shall confirm a delivery date as a date for Delivery ("Acknowledged Delivery Date").

5.4.  It shall be deemed a prerequisite to the acceptance of all orders that payment of 70% (seventy percent) of the requested order quantity, as calculated in Exhibit B, is to be received by the Company in order to initiate the manufacturing of the Products, with the remaining 30% (thirty percent) due on confirmation of sealed container with signed bill of lading.

5.5.  The Company shall use its best efforts to ensure that Products ordered are ready for Delivery at the Acknowledged Delivery Date, but shall under no circumstances be liable for any consequential loss or damage resulting from its failure to meet such Acknowledged Delivery Date.

5.6.  The Distributor and/or a duly authorized employee and/or agent shall inspect and accept the Products on behalf of the Distributor on delivery and shall accordingly sign a delivery note in confirmation of the acceptance of the Delivery of the Products in good order and quality, which order shall be sent to the Company by e-mail within 24 (twenty-four) hours from receipt of the goods. Shipments are confirmed with signed bill of lading, if any discrepancies occur according to the finalized confirmed order, Company will correct the discrepancy on the next order with a 30% discount clause on a confirmed negligence. This discount will account for only the addressed incident and not for the whole shipment. I.e one Tacoma canopy not loaded, but a F150 instead as per order. 30% discount will be allowed on the next order of the first Tacoma canopy of the same model.

5.7.  The terms and conditions set forth in the Distributor's purchase Order and/or other standard documentation are expressly excluded and shall not be of any force and effect in relation to this Agreement.

5.8.  Each Order for the Products shall constitute a separate contract, and any default by the Company in relation to any one order shall not entitle the Distributor to treat this Agreement as terminated.

5.9. All orders will be subject to the integrated minimum manufacturing and minimum shipment requirement as contained in Exhibit B.

## 6.      PRICE

6.1.  The price(s) applying on the sale of Products by the Company to the Distributor under this Agreement shall be the price(s) set out in the Exhibit "B" as amended from time to time by the Company on sixty (60) days prior notice. During this sixty (60) day notice period, the Distributor may place additional Orders. The Company shall handle such Orders and existing orders at the then ruling price provided deliveries are scheduled within a period of thirty (30) days after the effective date of the price increase or such other time period as may be agreed upon between the Parties in writing. The Company may from time to time provide recommended resale prices.

6.2.  The price(s) set out in the Exhibit "B" shall constitute the net amount, exclusive of any taxes which may be levied on the supply and export of the Products, unless the context indicates otherwise.

## 7.      PAYMENT TERMS



7.1. Payment for Products, unless otherwise agreed in writing by the Parties, shall be effected by way of an Electronic Funds Transfer into the following account details:

Account Name: **RLD DESIGN (PTY) LTD**
Bank: **FIRST NATIONAL BANK (SOUTH AFRICA)**
Account Type: **CHEQUE**
Account Number: **625 612 932 85**
Branch Code: **250655**

2. The Company may provide Products to the Distributor on credit, on the sole discretion of the Company, subject to the Distributor completing a credit application, as may be provided by the Company from time to time, and complying with the terms in relation to any credit screening requested by the Company for approval of such credit application.

3. In the event that the Distributor shall fail to fully comply with the provisions of clauses 7.1 and/or 7.2 above, then the Company shall be entitled, without incurring any liability therefore, to cancel the relevant Order.

4. In the event of the Distributor cancelling the Order or part thereof within 30 (THIRTY) days prior to the Acknowledged Delivery Date, the Company shall in addition to and without prejudice to any other remedies available to the Company at law be entitled to payment of a standard cancellation fee of 100% of the total value of the Order.

5. Any amounts outstanding in terms of this Agreement shall incur an interest charge of two percent (2%) above prime rate at the largest bank in Nevada, as ascertained by the Commissioner of the financial institutions on any balance outstanding from time to time.

**8.      RISK AND OWNERSHIP**

8.1. In the event of credit purchases, ownership of the Products shall only pass to the Distributor upon payment of the purchase price in full as contemplated by clause 6 read with clause 7, notwithstanding delivery date. Risk for loss or damage is transferred to the Distributor upon collection of the Product(s) at the Premises of the Company, stipulated in Exhibit B.

8.2. In the event of cash upon order transactions, ownership shall pass to the Distributor on the date of collection of the Product(s) at the Premises of the Company, stipulated in Exhibit B. Risk for loss or damage is transferred to the Distributor upon collection of the Product(s) at the Premises of the Company, stipulated in Exhibit B.

**9.      DUTIES OF THE DISTRIBUTOR**

9.1.    The Distributor shall at its sole expense:

9.1.1.      use its best endeavors to promote to the utmost the sale and use of the Products and the Company's interests in the Territory;

9.1.2.    The Distributor shall make all professional and practical endeavours to continuously promote, market and sell the Products throughout the Territory to all potential purchasers. The Distributor shall ensure an efficient and appropriate marketing and sales strategy for the Products in the Territory in order to promote a positive image of the Products and of the Company;

9.1.3. purchase and carry in stock such quantities of the Products as may in the opinion of the Distributor, in consultation with the Company, be reasonable to meet market demand;

9.1.4. purchase and carry in stock such quantities as may be required by the Distributor, in consultation with the Company, to maintain the Products;

9.1.5.    at all times give to the Company and its officials or employees all reasonable and proper assistance to further the Company's interests, including information on market conditions and opportunities, details of sales made and Product service records;

9.1.6. within thirty (30) days of the Effective Date, and thereafter for each calendar quarter send the Company a forecast of its Product requirements for the following twelve (12) month period. This forecast shall be based on the best information available at this time to the Distributor. The Company's sole responsibility shall be for the actual quantities ordered by the Distributor pursuant to purchase orders issued by the Distributor;

9.1.7.    to obtain such approvals, licenses, permits, consents, certificates, authorizations (including but not limited to type approvals) ("Approval") as are required by the government or any regulatory or other authority of the Territory to qualify the Products for import into and sale and use in the Territory for all purposes, as soon as reasonably practicable. Such Approval shall be held jointly by the Distributor and the Company, so far as may be permitted by law, and upon the termination for any reason of this Agreement the Distributor shall take all steps necessary to transfer the full benefit of the Approval to the Company in so far as it may be permitted in law. Where such Approval is required by law to be held in the name of both Parties, the costs attached to such Approval shall be borne by both Parties in equal shares;

9.1.8. promptly notify the Company in writing of any claim or proceeding involving the Products or of any claimed defect in the Products;

9.1.9. promptly and fully notify the Company of any actual, threatened or suspected infringement in the Territory of any Intellectual Property of the Company which comes to the Distributor's notice, and of any claim by any third party so coming to its notice that the importation of the Products into the Territory, or their sale therein, infringes any rights of any other person, and the Distributor shall at the request and expense of the Company do all such things as may be reasonably required to assist the Company in taking or resisting any proceedings in relation to any such infringement or claim;

9.1.10.    comply with all legal requirements from time to time in force relating to the storage and sale of the Products.

9.2.    The Distributor shall not without the written consent of the Company:

9.2.1.    remove from the Products or alter in any way any way whatsoever the content and/or or trademarks forming part of the Product and/or pertaining to the Company in general and may not without the Company's prior



written consent use any additional marks on or in relation to the Products or alter the packaging of the Products, if any;

9.2.2.      assign or transfer in any manner the benefit of this Agreement;

9.2.3.      make any addition to or any modification of any of the Products prior to distribution.

9.2.4.      sell the Products outside the Territory;

9.2.5.      sell the Products within the Territory knowing or reasonably suspecting that they will be resold outside the Territory;

9.2.6.      make any representations, warranties or guarantees with reference to the Products except such as are consistent with the then current conditions of sale of the Company;

9.2.7.      incur any liability on behalf of the Company or in any way pledge or purport to pledge the Company's credit or accept any order or make any contract on behalf of the Company;

9.2.8.      utilize marketing materials, in any form whatsoever, being published and/or used and/or distributed, without the prior written approvals of such marketing materials, by the Company;

9.2.9.      re-package and/or re-brand the Products in any way, manner or form whatsoever;

9.2.10. subject to the laws of the foreign country concerned with regard to price-fixing in so far as the resale of Products are concerned, the Distributor may not offer the Products for sale at any price other than that recommended by the Company without the prior consent in writing of the Company.

9.3.   The Distributor shall make clear, in all dealings with Customers and prospective Customers that it is acting as distributor of the Products and not as agent of the Company.

9.4. Breach and/or non-adherence to any of the Distributor's Duties and/or obligations as set out in clauses 9.1 and/or 9.2 and/or 9.3 of this Agreement will constitute a material breach of the Agreement and the Company will be entitled (but not obliged) to terminate this Agreement without derogating from the legal remedies available to the Company in terms of this Agreement and in law in such circumstances.

5.      The Distributor shall, in exchange for the exclusive distribution rights granted to it in terms of this Agreement, be bound by a minimum quantity order per annum in accordance with the related provisions contained in Exhibit B. Should the Distributor fail to meet the above mentioned minimum quantity order requirement per annum, the exclusive rights granted to it in terms of this Agreement shall be remitted until such time as security can be provided to the Company by the Distributor for the purchase of the balance to meet the minimum quantity order requirement.

6.      The Company shall have no contractual claim to damage or loss of income against the Distributor in the event that the Distributor fails to meet the minimum quantity order per annum requirement.



7.      The minimum order quantity applicable to any successive annual term, shall be at the sole discretion of the Company and shall be communicated to the Distributor at least 60 (sixty) days prior to the commencement of such successive annual term, at no more than 50% increase over the previous term unless agreed by Distributor

## 10.    DUTIES OF THE COMPANY

10.1.   The Company shall:

10.1.1.    use its best endeavors to supply the Products to the Distributor in accordance with the Acknowledged Delivery Date;

10.1.2.    notify the Distributor of any problems pertaining to the supply by the Company of the Products;

3.      The Company shall not appoint any other distributor for the purpose of selling the Products in the Territory.

4.      The Company is responsible to ensure that all Products supplied to the Distributor meets the standards as set out in the industry, with all applicable quality, safety and other pertinent standards.

5.      The Company will assist the Distributor in providing to the Distributor, on its request, the already existing certificates relating to the standards, tests, reports or necessary existing information about the Products, if applicable.

6.      The Company will, at its own expense, supply the Distributor with such amount of catalogues and advertising material as the Company considers reasonably sufficient with a view to promoting sales of the Products within the Territory.

7.      The Company shall obtain all licenses, permits and authorizations necessary to export the Products to the Territory. The Company shall only export the Products if it has obtained and maintains all the necessary legal, administrative and/or contractual permits and/or requirements.

8.      The Company shall not, during the Term of this Agreement, directly or indirectly compete with the Distributor in the Territory, or in any manner engage in any business that provides any product(s) or service(s) that competes with any product(s) or service(s) offered or provided by the Distributor in the Territory.

9.      The Company shall not circumvent, avoid, bypass, or obviate, directly or indirectly, the intent of this Agreement to maintain Distributor as the sole and exclusive distributor in the Territory during the Term of this Agreement.

## 11.    RESERVED RIGHTS OF THE COMPANY

11.1.   The Company reserves to itself the right, notwithstanding anything to the contrary contained in this Agreement to:

11.1.1.    vary the Schedule of Products either by withdrawing a Product or (with the agreement of the Distributor) introducing new or revised products for sale. Each new or revised product so introduced shall be added to the Agreement by means of an Additional Schedule and shall thereafter be deemed a Product for the purposes of this Agreement;

11.1.2.____decline to accept any Order placed on it if:

      11.1.2.1.__it is for a quantity or value below the Company's minimum quantity or value requirement as notified to the Distributor from time to time;

      11.1.2.2.__The Company is of the view that the Order is for Products which will be sold or used in a way which is in conflict or inconsistent with the provisions of this Agreement;

      11.1.2.3.__The Distributor is in default with regard to payment for Products previously ordered by the Distributor or is in breach of any of its other obligations to the Company under this Agreement;

      11.1.2.4.__there is a shortage in the availability of Products, or materials to manufacture the Products, and for any reason and the Company is operating a rationing system as between the Distributor and other distributors and representatives after consultation with said distributors and representatives;

11.1.3.__The Company shall promptly notify the Distributor of its decision not to accept any order but failure to so notify shall not be deemed proof of acceptance of any order and no obligation or liability to the Distributor or any other party shall be incurred by the Company in so declining to accept any order.

11.2.__The Company shall reasonably endeavor:

      11.2.1.____to notify The Distributor at least sixty (60) days prior to the delivery of any Product which incorporates a change in design that will affect the performance or use of the Product;

      11.2.2.____to notify The Distributor at least sixty (60) days prior to the discontinuance of manufacture of any product or such other time period as may be agreed between the Parties.

11.3.__The terms of the above clause 11.2 excludes the very first order to be placed with the Company in terms of this Agreement whereby the notification to the Distributor regarding change in design or discontinuance of manufacture of any product will be made by the Company immediately on the Distributor ordering the product.

## 12.   LIMITED WARRANTY

12.1.__The Company warrants that the Products delivered comply with the details shown on the Purchase Order, as amended from time to time, or the specifications as prescribed by the Customer in writing and agreed upon between the Distributor and the Company (prescribed specifications).

12.2.__Liability for breach of the warranty set out in clause 12.1 will only arise where the Customer has established, in addition to any other proof required by law, that:

      12.2.1.____the Product has been inspected before use;

      12.2.2.__inspection, sampling methods and interpretation of test results have been carried out in strict compliance with the specifications therefore, these being no less stringent than the prescribed specifications;

      12.2.3.__the Customer and/or the Distributor has notified the Company by e-mail within 48 (fourty eight) hours of its tests revealing an alleged non-conformity with specification, provided that written notification was given within a maximum of 7 (seven) days after the tests revealing an alleged non-conformity;

12.2.4.   all records relating to the handling, sampling, curing and testing of the Product and the interpretation of any tests in respect thereof were made available to the Company for inspection; and

12.2.5.   after delivery has occurred, the Product was not stored, misused, neglected, contaminated, improperly handled or altered in any way and that no foreign material was added to the Product.

12.3.   Under no circumstances will the Company be liable for direct, consequential, general or special damages arising out of:

12.3.1.   the use by the Customer of the Product contrary to instructions and warnings provided;

12.4.   Notwithstanding the provisions of clause 12.3 herein above, the Company's liability in respect of the supply of defective Product will be:

12.4.1.   the replacement of such defective Product; or

12.4.2.   the refund to the Distributor of the cost at which the Distributor purchased such defective Product;

12.4.3.   The Company offers a limited warranty of 2 (two) years for the components of each individual product, which warranty excludes fair wear and tear and/or misuse of the Product.

## 13.   LIMITED LIABILITY

13.1.  The liability of the Company to the Distributor for any defects in the Products shall be limited to the terms of the warranty set out in Clause 12.

13.2.  Except as specifically set out herein, the Company shall not be liable towards the Distributor for any loss, damage (including consequential loss and/or damage), cost, expense or claim howsoever arising from the conclusion, execution or maintenance of this Agreement.

13.3.  The Distributor shall indemnify the Company and keep it indemnified against all claims (including loss, expense, damage or cost) for injuries, suffered by any person or damages incurred to any property, arising from the use of the Product and which arose as a consequence of the Distributor's negligence, recklessness or intent and/or the Distributor's failure to comply with any applicable provisions of this Agreement. Distributor will carry insurance (and require subsequent installers and dealers to carry insurance) to cover fitment of the Products. Company will assume liability for product failure and defect due to materials and manufacturing error.

## 14.   INTELLECTUAL PROPERTY

14.1.  The Company retains for itself all intellectual property rights related to the Products, whether owned by the Company or used by the Company under license, unless the contrary appears from the context of this Agreement. As used here "intellectual property rights" means, with respect to any technology, all related patent rights, copyrights, inventions, designs, formulae, trade secret rights, trade mark rights and other intellectual property rights therein and thereto.

14.2.  Each Party shall indemnify the other against all losses, damages, reasonable costs, actions, claims, or demands in respect of the infringement or alleged infringement of the intellectual property rights of any third party as a result of any matter supplied by one Party to the other for the purposes of this Agreement.



14.3. The Distributor acknowledges and agrees that any intellectual property rights in the product(s), including, but not limited to, trademarks, patents, designs, copyright, know-how, show-how and/or trade secrets, whether registered in the Territory or not, shall form part of the intellectual property of the Company and the Distributor shall have no right, title or interest, for purposes other than that of the execution of this Agreement, therein, unless reduced to writing and signed by both parties.

## 15.    CONFIDENTIALITY

15.1. The Parties shall hold in confidence all Confidential Information received from each other and not divulge the Confidential Information to any person, including any of its employees, save for employees directly involved in the execution of this Agreement.

15.2.   The Parties shall prevent disclosure of Confidential Information except as may be required by law.

15.3. Immediately after the termination of this Agreement, for whatever reason, the recipient of Confidential Information shall return same or at the discretion of the original owner thereof, destroy such Confidential Information, and shall not retain copies, samples or excerpts thereof.

15.4. It is recorded that the following information will, for the purposes of this Agreement, not be considered Confidential Information:

15.4.1. information known to the public or generally available to the public prior to the date that it was disclosed by either of the Parties to the other; or

15.4.2.   information which becomes known to the public or becomes generally available to the public subsequent to the date that it was disclosed by either of the Parties to the other, through no act or failure to act on the part of the recipient of such information; or

15.4.3.     information which either of the Parties, in writing, authorizes the other to disclose; or

15.4.4.     is developed independently by either of the Parties in circumstances that do not amount to a breach of the provisions of this Agreement.

## 16.    TERMINATION

<u>With Cause</u>

1.    This Agreement may be terminated immediately by notice in writing by either Party:

1.1.    if the other Party is in material or continuing breach of any of its obligations under this Agreement and fails to remedy the breach (if capable of remedy) for a period of thirty (30) days following receipt of written notice from the other Party specifying the breach; or

1.2.    if the other Party is involved in any legal proceedings concerning its solvency, or ceases trading, or enters into liquidation, whether compulsory or voluntary, or makes an arrangement with its creditors or petitions for an administration order, or has a receiver or manager appointed over all or any part of its assets, or generally becomes unable to pay its debts; or

1.3.    the controlling interest or ownership in either of the Parties becomes vested in a competitor of either of the Parties. For the purpose of this clause, the Party who makes this allegation shall carry the burden to prove same; or

1.4.    the other Party infringes the copyright, trade secrets or patent of any third party, in order to meet all or some of its obligations contained in the Agreement.

2.    In the event that any change in any law, regulation, ordinance or similar official decree renders any part of this Agreement illegal or null and void, either Party may terminate this Agreement forthwith.

3.    Termination of this Agreement under clauses 16.1 and 16.2 shall be without prejudice to any other rights or remedies of either Party under this Agreement or at law and will not affect any accrued rights or liabilities of either Party at the date of termination.

<u>Consequences of Termination</u>

4.    Upon termination of this Agreement, howsoever occasioned:

4.1.    Orders received by the Company from the Distributor and accepted by the Company before the date of termination shall be carried out;

4.2.    The Distributor shall return immediately to the Company all confidential information, recommended price lists, quotations, discount sheets and all other documents which the Distributor has received from the Company except those distributed in the normal course of trade;

4.3.    The Distributor shall respect the obligation of confidentiality imposed on it in terms of this Agreement for a period of 2 (two) years after the date of termination.

5.    Without prejudice to any liability which may have accrued hereunder it is hereby specifically agreed by the Parties that where this Agreement is lawfully terminated by either Party for any reason whatsoever no discount commission, compensation damages or the like shall be payable to the other Party as a consequence of such termination. Without prejudice to the foregoing, to the full extent allowed by any applicable law, the Parties agrees that they shall have no rights to damages or indemnification of any nature due to any expiration or rightful termination of this Agreement by either Party pursuant to its terms. The foregoing restriction shall include without limitation, any commercial severance payment whether by way of loss of future profits, expenditure for promotion of the Products, payment for goodwill generated or other commitments made in connection with the business contemplated by this Agreement or other similar matters. A Party will not be entitled under local law or otherwise to receive any such payment any right to which the other Party hereby waives and disclaims. The Parties expressly waive and renounce any claim to compensation or for indemnification for termination of this Agreement which may exist under the laws of any applicable jurisdiction.

## 17.    DISPUTE RESOLUTION

1.    In the event that a dispute arises as to the interpretation or validity of this Agreement (a "Dispute"), then either Party may give written notice to the other party of such Dispute and may initiate the dispute resolution procedure as set out in this clause 17.

2.    The Parties shall endeavor to settle the Dispute through negotiation and if the Dispute cannot be settled through negotiation, the Parties may agree to refer the Dispute to an agreed mediator who shall endeavor to assist the Parties to



settle the Dispute by agreement.

3.    If the Dispute is not settled by negotiation or mediation within 15 (fifteen) Business Days of the notice in terms of clause 17.1, or such longer period of time as the Parties may agree in writing, then the Dispute shall be determined by final and binding arbitration as set out below.

4.    A single arbitrator shall be agreed upon by the Parties and, failing agreement, shall be appointed in accordance with the procedure in clause 17.13.

5.    The arbitrator shall be an attorney or advocate who is admitted to practice as such in the State of Nevada and who has had at least 10 (ten) years' experience as an admitted attorney or advocate in the State of Nevada.

6.    The Parties may agree on the procedure to be followed prior to and during the arbitration, as well as the time and place of the arbitration hearing. Failing such agreement, the arbitrator shall determine the procedure to be followed and shall fix the time and place for the arbitration hearing.

7.    The arbitrator shall determine the Dispute in accordance with the law of the State of Nevada and shall have the same remedial powers as a court of law would have were it adjudicating the Dispute.

8.    Unless otherwise agreed in writing by the Parties, the arbitration shall be held in the County of Clark, State of Nevada.

9.    The arbitrator shall render his or her award together with written reasons therefore within a period of 30 (thirty) business days from the date upon which the arbitration ends.

10.    The award of the single arbitrator shall be final and binding on the Parties, subject to review by a panel of three arbitrators.

11.    Subject to the other provisions of this clause 17, the arbitration shall be held in accordance with the provisions of the Commercial Arbitration Rules of the American Arbitration Association ("AAA").

12.    Nothing in this clause 17 shall preclude any Party from seeking any urgent interim relief from any court of competent jurisdiction.

13.    Mechanism for appointment of the arbitrator:

13.1.    If for any reason the arbitrator agreed upon by the Parties cannot or does not accept an invitation to arbitrate, then the Parties may agree on another arbitrator.

13.2.    If the arbitrator does not accept an invitation to arbitrate, or if the Parties have failed to agree on the arbitrator, then any Party may ask the AAA to submit to each Party an identical list of names of potential arbitrators. Each of the potential arbitrators suggested by the AAA shall be an attorney who is admitted to practice as such in the State of Nevada and who has had at least 10 (ten) years' experience as an admitted attorney.

13.3.    Each Party shall have 5 (five) Business Days from the date upon which that Party receives the list called for in clause 17.13.2 to cross off that list any names to which that Party objects, number the remaining names in order of preference and return the list to the AAA. If a Party does not return the list within the time specified, all of the persons named therein shall be deemed acceptable as potential arbitrators.

14.     The AAA shall then suggest to the Parties in writing the name of the arbitrator from among the potential arbitrators who have been approved on both lists and having regard to the designated order of preference.

15.     If the Parties fail to agree on the AAA's written suggestion referred to in clause 17.13.4; or if the suggested arbitrator is unable to act; or if for any reason an appointment cannot be made from the submitted lists, the AAA shall appoint the arbitrator, without the submission of any further lists but with regard to the lists submitted in terms of clause 17.13.3.

16.     Notwithstanding any other provision of this clause 17, should the AAA fail or refuse to implement the provisions of clause 17.13, then any Party may file a lawsuit exclusively in the state or federal courts located in Clark County, Nevada.

**18.     GOVERNING LAW AND JURISDICTION**

1.      Regardless of the place of execution, performance or *domicile* of the Parties, this Agreement and all modifications and amendments thereto shall be governed by and construed under and in accordance with the substantive laws of the State of Nevada.

2.      The Parties hereby irrevocably agree and consent to the exclusive jurisdiction of the state and federal courts located in Clark County, State of Nevada, in respect of all matters arising out of and disputes in connection with this Agreement, except for the Disputes which may shall be referred to Arbitration in terms of clause 17.1 above.

**19.     RELATIONSHIP**

The Distributor is an independent legal entity acting in its own name, on its own behalf and at its own risk. This Agreement does not constitute either of the Parties an agent, partner or legal representative of the other for any purposes whatsoever and neither of the Parties shall be entitled to act on behalf of or represent the other unless duly authorized thereto in writing. The Distributor shall not take any action or engagement in the name of the Company and will clearly identify itself as a distributor.

**20.     RESTRAINT**

Neither of the Parties shall, at any stage after the commencement of this Agreement and for a period of two (2) years after this Agreement has terminated, make any offers of employment to any staff member, who is or has been employed by the other and has been involved in the execution of this Agreement. The aforementioned restraint shall not be applicable in the event where the prior written approval to make such an offer has been obtained from the Party who is or has been the employer of such staff member. For the purpose of this clause "staff member" shall include but not be limited to permanent employees, part-time employees and independent contractors.

**21.     SEVERABILITY**

Each of the provisions set out in this Agreement shall be deemed to be a separate and independent provision severable from each of the other provisions and shall be separately enforceable, notwithstanding that it may appear with any other provision or is expressed conjunctively or disjunctively from or alternatively to any other provision. If the whole or any part of a provision in this Agreement is invalid or unenforceable for any reason, the validity and enforceability of the rest of the provision shall not be affected.

**22.     WHOLE AGREEMENT**



This Agreement constitutes the entire Agreement between the Parties regarding the subject matter hereof. No Agreements, guarantees or representations, whether verbal or in writing, have been concluded, issued or made, upon which either Party is relying in concluding this Agreement, save to the extent set out herein.

### 23.    NO VARIATION

This Agreement is intended to be a final expression of the Agreement between the parties and a complete and exclusive statement of the terms thereof and no variation of, or addition or agreed cancellation to this Agreement shall be of any force or effect unless it is reduced to writing and signed by or on behalf of the Parties.

### 24.    SUPERSESSION

The provisions of this Agreement shall supersede and prevail over any other arrangement, either oral or written, between the Parties and relating to the subject matter of this Agreement, unless specifically agreed to otherwise in writing between the Parties.

### 25.    RELAXATION

No indulgence, leniency or extension of a right, which either of the Parties may have in terms of this Agreement, and which either Party ("the Grantor") may grant or show to the other Party, shall in any way prejudice the Grantor, or preclude the Grantor from exercising any of the rights that it has derived from this Agreement, or be construed as a waiver by the Grantor of that right.



## 26.    WAIVER

Any waiver by either Party of a breach of any provision of this Agreement by the other Party shall not operate or be construed as a waiver of any subsequent breach of such provision or any other provision hereof.

## 27.    NO CESSION OR ASSIGNMENT

This Agreement is personal to the Parties and shall not be assigned, ceded or otherwise transferred in whole or in part by either Party without the prior written consent of the other Party.

## 28.    FORCE MAJEURE

28.1.    Neither of the Parties shall be liable for a failure to perform any of its obligations insofar as it proves:

28.1.1.    that the failure was due to an impediment beyond its control;

28.1.2.    that it could not reasonably be expected to have taken the impediment and its effects upon the Party's ability to perform into account at the time of the conclusion of this Agreement; and

28.1.3.    that it could not reasonably have avoided or overcome the impediment or at least its effects.

28.2.    An impediment, as aforesaid, may result from events such as the following, this enumeration not being exhaustive:

28.2.1.    war, whether declared or not, threats of war, civil war, civil violence, hostiles, riots and revolutions, acts of sabotage;

28.2.2.    natural disasters such as violent storms, cyclones, earthquakes, tidal waves, floods, destruction by lightning or like natural disasters;

28.2.3.    explosions, fires, destruction of machines, factories and any kind of installations;

28.2.4    boycotts, strikes and lock-outs of all kinds, go-slows, occupation of factories and premises, work stoppages and labor unrest;

28.2.5    acts of authority, whether lawful or unlawful, actions or restrictions imposed by government authorities, apart from acts from which the Party seeking relief has assumed the risk by virtue of any other provisions of this Agreement.

28.3.    For the purposes of this clause "impediment" does not include lack of authorizations, of licenses, of permits or of approvals necessary for the performance of this Agreement and to be issued by the appropriate public authority.

28.4.    Relief from liability for non-performance by reason of the provisions of this clause shall commence on the date upon which the Party seeking relief gives notice of the impediment relied upon and shall terminate upon the date upon which



such impediment ceases to exist; provided that if such impediment continues for a period of more than sixty (60) days either of the Parties shall be entitled to terminate this Agreement.

28.5.   In the event this clause is exercised by Company, Company shall provide refunds for payments made on portions of existing orders that are not fulfilled.

## 29.    NOTICES AND DOMICILIA

29.1.   Each of the Parties chooses the *domiclium citandi et executandi* ("*domicilium*") as described in Schedule of this Agreement, for the purpose of the giving of any notice in terms of this Agreement.

2.   Each of the Parties shall be entitled from time to time, by written notice to the other, to vary his *domicilium* to any other address, which is not a post office box or poste restante.

3.   Any notice given in connection with this Agreement shall be:

    3.1.   delivered by hand; or

    3.2.   sent by prepaid registered post; or

    3.3.   sent by courier; or

    3.4.   sent by e-mail

to the *domicilium* chosen by the Party concerned.

4.   A notice given as set out above shall be deemed to have been duly given (unless the contrary is proved):

    4.1.   if delivered by hand, on the date of delivery; or

    4.2.   if sent by prepaid registered post, on the 7th (seventh) day of posting; or

    4.3.   if sent by courier, on the date of delivery by the courier service concerned; or

    4.4.   if sent by e-mail, on the expiration of 24 (twenty four) hours after the time of transmission.

## 30.    GOOD FAITH

In the implementation of this Agreement, the Parties undertake to observe the utmost good faith and warrant in their dealings with each other that they shall neither do anything nor refrain from doing anything which might prejudice or detract from the rights, assets or interest of any other(s) of them.

## 31.    COMPLIANCE & CORRUPT PRACTICES



1. The Parties shall comply with all applicable laws, rules and regulations of the Republic of South Africa and the United States of America.

2. Neither Party shall be required to supply or distribute any material or information in violation of any law, regulation, ordinance or other official decree or, if such supply or distribution can only be made with the approval of a governmental authority, without approval of that authority.

3. The Distributor will not under any circumstances offer, promise or make any gift, payment, loan, reward, inducement, benefit or other advantage to any person, entity, government official or the like in the furtherance of this Agreement or the obligations stipulated in this Agreement.

4. No part of any compensation, fee, expense or reimbursement paid:

   4.1. by the Distributor to the Company; or

   4.2. by the Company to the Distributor,

shall be used directly or indirectly to make any payment to any person or entity, or to provide any payment, gratuity, emolument, or other benefit to an official of any government or any political party.

## 32. CONFLICT

The terms and conditions set out in this Agreement shall prevail in the event of any conflict or inconsistency between the terms and conditions of this Agreement and the exhibits thereto.

## 33. BINDING EFFECT

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.

SIGNED at _RLD Design_ on this 17th day of March 2021. in the presence of the undersigned witnesses:

WITNESSES:

1. R Ludik _____

   _____
   SIGNATURE: RLD DESIGN (PTY) LTD

2. CG de Villiers _____

Full name of representative, who warrants that he is duly authorized thereto

31278 Bocaw Crcle
SIGNED at _Temecula, CA 92592_ on this _19_ day of _March_ 2021.

In the presence of the undersigned witnesses:

**WITNESSES:**

1.   TOM Hession-Herzog

2.   Arta Conder

_(signature)_

Full name of representative, who warrants that he is duly authorized thereto

_(signature)_

SIGNATURE: THE DISTRIBUTOR

TOM Hession-Horzog/Advertwenobile Inc.

Full name of The Distributor

EXHIBIT "A"

**PRODUCTS, PRICES AND SPECIFICATIONS**

## A.1 PRODUCTS

The Products applicable to this Agreement are defined as manufactured canopies for pickup trucks/bakkies.

## A.2 SPECIFICATIONS

The Company shall provide, in the form of an addendum to this Agreement, detailed specification documents with regard to each different model to be manufactured after the Parties have determined and agreed on the specifications of the Products.

All canopies will comprise of the following standard features/materials:

- Stainless Steel construction;
- Front and rear solid toughened glass;
- Pressure lever locks (Furnlock);
- 2 X gas struts per door;
- Gull-wing side doors opening upwards;
- Back door handle;
- Powder coated exterior RAL colour;
- Secondary colour on doors;
- 3 X Roof rails complimentarily bent into roof section;
- Pre-cut mounting holes in roof rails;
- Concomitant seals and rubbers; and
- Positive pressure vent.

## A.3 ADDITIONAL OPTIONS ON CANOPIES

- Colour matching;
- Kitchen units;
- Kitchen unit foam insert;
- Ammunition crate slider;
- Drawer system;
- Bin slider;
- Roof Rack;
- Side solid windows in gull-wing door;
- Side sliding windows in gull-wing door;
- LED roof light; and
- Roof mounted table;



EXHIBIT "B"

**PRICE OF PRODUCT, SHIPPING TERMS AND MINIMUM SHIPMENT REQUIREMENTS**

## B.1 MINIMUM SHIPMENT REQUIREMENTS

In accordance with clause 9.5, the Distributor shall, in order to maintain its exclusive distribution rights in terms of this Agreement, be bound by a minimum quantity order per annum of 210 (two hundred and ten units) of Product(s).

## B.2 PRICE OF PRODUCT

As per e-mail correspondence between the parties, starting from $1485 (one thousand four hundred and eighty five US dollars).

The Company shall provide a quotation to the Distributor for each individual model canopy to be manufactured for the Distributor. After the specification documents have been compiled by the Company, the Company will compile finalised prices on each different model of the Products to be manufactured by the Company. The aforementioned finalised pricing documents shall form the Pricing Addendum to this Agreement once signed by both Parties.

## B.3 SHIPPING TERMS

The INCO shipping term, applicable to this Agreement, is acknowledged and agreed between the parties as EXW (EX WORKS).

The Distributor shall be responsible for the transport of the Product(s) ordered, from the premises of the Company's manufacturing facility to, and only to, the Territory.

A single shipment of Product will occur by transporting at least 35 (thirty five) units of the Product in one 40 (fourty) foot container [**1 X 40' container**], unless otherwise agreed between the parties in writing.

Shipping costs shall be the sole responsibility of the Distributor and shall be for the account of the Distributor.

**Note must be taken that:**

- Prices of the Product and shipping costs, if applicable, are best estimates based on current prices of raw materials at the time of signature;
- Prices of raw material are subject to exchange rate fluctuations;

The Company will quote EXW shipping costs for each individual shipping order at the time of placement of order;



# <u>EXHIBIT B</u>
# To Complaint

## Sample RLD Invoice (containing Terms and Conditions for Orders placed)



# COMMERCIAL INVOICE

**Invoice Date**
24 May 2021

RLD Design (Pty) Ltd
18 Rooiberg Street,N4
Gateway Industrial Park
Willow Park Manor X65
Pretoria
Gauteng
South Africa
0184
Customs Code: 25023642

Adventure Mobile ,INC
Attention: COMMERCIAL INVOICE
4021 13th Ave W
SEATTLE WASHINGTON 98199
USA

**Account Number**

**Invoice Number**
INV-2478

Ziegler Logistics
South Africa
0861 ZIEGLER

Shipping Address:

Adventure Mobile, INC
4021 13th Ave W
SEATTLE WASHINGTON 98199
USA

**Reference**
AM2021-08(2)

**VAT Number**
4900272487

| Description | Quantity | Unit Price | VAT | Amount USD |
|---|---|---|---|---|
| CAN_USA_TACO_LWB, Toyota Tacoma Long Wheelbase (Black / White cw. Sliding Side WIndows) | 1.00 | 1,797.00 | Zero Rate (only Exported Goods) | 1,797.00 |
| CAN_USA_TACO_LWB, Toyota Tacoma Long Wheelbase (Black / Black cw. Sliding Side Windows) | 2.00 | 1,797.00 | Zero Rate (only Exported Goods) | 3,594.00 |
| CAN_USA_TACO_LWB, Toyota Tacoma Long Wheelbase (Black / Black) | 2.00 | 1,657.00 | Zero Rate (only Exported Goods) | 3,314.00 |
| CAN_USA_TACO_SWB, Toyota Tacoma Short Wheelbase (Army Green full cw. Sliding Side Windows) | 1.00 | 1,947.00 | Zero Rate (only Exported Goods) | 1,947.00 |
| CAN_USA_TACO_SWB, Toyota Tacoma Short Wheelbase (Black / Black cw. Sliding Side Windows) | 3.00 | 1,647.00 | Zero Rate (only Exported Goods) | 4,941.00 |
| CAN_USA_TACO_SWB, Toyota Tacoma Short Wheelbase (Black / Black) | 13.00 | 1,507.00 | Zero Rate (only Exported Goods) | 19,591.00 |
| CAN_USA_TUN_SB, Toyota Tundra Short bed (5,5ft) (Black / Black) | 2.00 | 1,622.00 | Zero Rate (only Exported | 3,244.00 |

# PAYMENT ADVICE

To:   RLD Design (Pty) Ltd
18 Rooiberg Street, N4 Gateway Industrial Park
Willow Park Manor X65
PRETORIA GAUTENG 0184
SOUTH AFRICA

| Customer | Adventure Mobile ,INC |
|---|---|
| Invoice Number | INV-2478 |
| Amount Due | 69,204.50 |
| Due Date | 30 Jul 2021 |
| Amount Enclosed | |

Enter the amount you are paying above

Company Registration No: 2015/298636/07. Registered Office: 18 Rooiberg Street, N4 Gateway Industrial Park, Willow Park Manor X65, Pretoria, Gauteng, 0184, South Africa

| Description | Quantity | Unit Price | VAT | Amount USD |
|---|---|---|---|---|
| | | | Goods) | |
| CAN_USA_TUN_MB, Toyota Tundra Mid bed (6,5ft) (Black / White cw. Sliding Side Windows) | 1.00 | 1,912.00 | Zero Rate (only Exported Goods) | 1,912.00 |
| CAN_USA_RAM2500_SB, Dodge RAM 2500 SB (6,5ft) (2020+/60Deg/V2) (Black / Black) | 1.00 | 1,772.00 | Zero Rate (only Exported Goods) | 1,772.00 |
| CAN_USA_CHE_SB, Chev Colorado Short Bed (White / White) | 1.00 | 1,507.00 | Zero Rate (only Exported Goods) | 1,507.00 |
| ACC_LIONB, Lion Box | 50.00 | 22.00 | Zero Rate (only Exported Goods) | 1,100.00 |
| acc draw, Drawer System (Unequal) | 1.00 | 900.00 | Zero Rate (only Exported Goods) | 900.00 |
| RLD_Ghostawn360, RLD Ghost Awn 360 2.45m | 25.00 | 740.00 | Zero Rate (only Exported Goods) | 18,500.00 |
| RLD_ACC_AWN_CLAMP, Clamp Bracket RLD Ghost Awn | 25.00 | 55.00 | Zero Rate (only Exported Goods) | 1,375.00 |
| USA_PCK_GhostAwn, GhostAwn MDF Packaging Box | 25.00 | 29.62 | Zero Rate (only Exported Goods) | 740.50 |
| RLD_ACC_TRANS_BOX, Packaging Transport Box | 27.00 | 110.00 | Zero Rate (only Exported Goods) | 2,970.00 |
| Customs tariff code for the above - 8708.29 | | | Subtotal | 69,204.50 |
| | | | Total Zero Rate (only exported goods) 0% | 0.00 |
| | | | Invoice Total USD | 69,204.50 |
| | | | Total Net Payments USD | 0.00 |
| | | | **Amount Due USD** | **69,204.50** |

**Due Date: 30 Jul 2021**

**\* Total VAT equivalent to ZAR 0**
1 ZAR = 0.0718112 USD

Company Registration No: 2015/298636/07. Registered Office: 18 Rooiberg Street, N4 Gateway Industrial Park, Willow Park Manor X65, Pretoria, Gauteng, 0184, South Africa

**Terms and Conditions**

1.   DEPOSIT

1.1.   The Customer acknowledges an order only becomes final and binding upon the payment of the deposit for any products and/or goods or services of RLD Design. Failure to pay the full deposit amount will result in the order not being placed.

2.   CANCELLATION

2.1.   RLD Design reserves the right to cancel any order placed by a Customer. Either party may cancel the agreement by giving the other party written notice of such cancellation.

2.2.   In the event the cancellation of the order by the either party, the Customer will be entitled to recover the deposit amount, or a portion thereof which is set out as follows:

2.2.1.   where cancellation of any standard order goods is made prior to the powder coating process, the full deposit amount minus a reasonable cancellation fee of 15% of the deposit amount is recoverable by the Customer, which cancellation fee you as the customer hereby acknowledges to be fair and reasonable;

2.2.2.   where cancellation for standard order goods occurs prior to the fitment of the products, the full deposit amount minus a reasonable cancellation fee of 15% of the deposit amount is recoverable by the Customer, which you as the Customer on payment of the deposit acknowledges to be fair and reasonable;

2.2.3.   where there is a cancellation for custom products or services, none of the deposit will be recoverable by the customer, and RLD Design is entitled to retain the full deposit amount.

3.   DELIVERY

3.1.   Delivery of products may take place at the place of business of RLD Design or by courier at the Customer's expense.

3.2.   The Customer agrees that they will be deemed to have been afforded an opportunity for the inspection and acceptance the products upon signing for the acceptance of the delivery.

3.3.   Should the Customer or its appointed agent fail to take delivery of the product within 3 business days after completion, the Customer shall be liable for all costs involved in the storage of the product until delivery takes place.

4.   INTELLECTUAL PROPERTY RIGHTS

4.1.   The Customer, by accepting delivery of any goods from RLD Design, hereby assigns all rights it may have acquired in any and all copyrighted works to RLD Design  and further recognises and agrees that the copyright and other intellectual property rights in all products and goods which are designed and manufactured by RLD Design including all portions, reproductions, corrections, accessories, modifications, or enhancements are the exclusive property of RLD Design.

4.2   The Customer will not attempt to and/or permit anyone else to attempt to modify, modify, copy for distribution, or reverse engineer any of the products of RLD Design, except where otherwise provided by applicable laws in South Africa.

5   WARRANTY

5.1   RLD Design warrants that all products will perform in terms of the specification provided by RLD and shall promptly provide replacements or corrections to any product which does not so perform in accordance with the granted warranties, which are set out as follows:

5.1.1   a 2 (two) year warranty for the structural integrity on all products;

5.1.2   a 1 (one) year warranty on the coating of all products on both a coastal and inland basis;

5.1.3   a 1 (one) year warranty on all struts, hinges, and locks.

5.2   The warranty only covers defects or errors which were present at the time of purchase or which arise due to the normal use of the products. The warranty will not cover any defects to products which occur as a result of the

improper use, use other than for the intended purpose, inadequate maintenance, or damage caused either willfully or negligently by the Customer or a third party.

5.3    Any products couriered to the Customer exclude a warranty for any problems relating to the fitting or leaking of the Products.

5.4    All warranties are only serviceable at RLD Design factory, situated in Pretoria.

6      RISK AND OWNERSHIP

6.1    The risk of damage to the goods passes to the Customer when the goods leaves RLD Design's premises.

6.2    Ownership of the goods shall not pass to the Customer until payment of the full purchase price has been received by the Company.

7      LIMITATION OF LIABILITY

7.1    Any claim by the Customer against RLD Design, howsoever arising shall in the aggregate be limited to the amount reflected on the invoice in respect of which the claim relates. RLD Design will not be liable to the Customer for, indirect or special damages and/or, loss of income or profit, howsoever arising whether or not caused by its employees, agents and/or contractors, and regardless of form or cause of action.

# <u>EXHIBIT C</u>
# To Complaint

**Undated Letter from RLD sent and/or emailed by RLD to Adventuremobile's dealers and customers "RE: CUSTOMER DISSATISFACTION AND DELAYS IN SUPPLY"**



18 Rooiberg Street, N4 Gateway Industrial Park
Willow Park Manor X65, Pretoria, Gauteng, 0184
South Africa

sales@rlddesign.co.za   +27 (0)76 743 8966
www.rlddesign.co.za    VAT No. 4900272487

Dear Sir/Madam,

**RE: CUSTOMER DISSATISFACTION AND DELAYS IN SUPPLY**

As you may know, we (RLD Design (Pty) Ltd- a private company based in the Republic of South Africa) are the supplier of the RLD patented and branded canopies distributed and sold by Adventuremobile Inc, as our exclusive distributor in North America (including the USA, Canada and Mexico).

It has recently come to our attention that a number of customers have raised their dissatisfaction with the products or as a result of ongoing delays experienced with regard to the supply and delivery of the products, payment of which has in some cases already been made to Adventuremobile Inc.

We unfortunately cannot directly engage with you with regard to dissatisfaction which you may have experienced with regard to the products, we request that you please refer such complaints to Adventuremobile Inc who are required to address such complaints. Should such dissatisfaction or complaint arise from a fault in the production of the products for which RLD Design (Pty) Ltd is liable in terms of the distribution agreement concluded between RLD Design (Pty) Ltd and Adventuremobile Inc (as opposed to say the installation or workmanship of Adventuremobile Inc or damage occurring to the products during the shipping or storage of the products by Adventuremobile Inc) then such product defects shall be dealt with between Adventuremobile Inc and RLD Design (Pty) Ltd in accordance with the terms of the distribution agreement concluded between us.

With that being said, we wish to express our sincere apologies for any dissatisfaction or inconvenience arising from delays in the supply and delivery of the products. The delays have regrettably been beyond the control of RLD Design (Pty) Ltd, as the delays in the supply and delivery of the products from our side have been occasioned by a failure by Adventuremobile Inc to pay RLD Design (Pty) Ltd the deposits required to enable RLD Design (Pty) Ltd to commence with the production of the relevant products, despite demands therefore.

Insofar as you have paid Adventuremobile Inc for products which have not been supplied or delivered to you, you will unfortunately have to engage with Adventuremobile Inc in respect of such complaints or claims for a potential refund, given that Adventuremobile Inc is an independent trader to RLD Design (Pty) Ltd.  We have to date merely supplied the products to Adventuremobile Inc as an independent and exclusive distributor of the products in North America (including the USA, Canada and Mexico).

As a result of an ongoing dispute with Adventuremobile Inc, the details of which dispute we are contractually not permitted to disclose, we wish to record that as of 11 May 2022, RLD Design (Pty) Ltd has formally terminated, with cause, the distribution agreement concluded between RLD Design (Pty) Ltd and Adventuremobile Inc.

We, at RLD Design (Pty) Ltd, pride ourselves on customer satisfaction and the superior quality of our products. Unfortunately, the prevailing circumstances have been beyond our control, but we would nevertheless like to express our sincere apologies for any delays, dissatisfaction or frustration caused via your dealings with Adventuremobile Inc or otherwise, as same is not a fair reflection of our standards, the way we treat customers nor the quality of our products. We wish to assure you that your continued support and business is and would be highly valued and appreciated.

In light of the termination of the distribution agreement we are now able to arrange or facilitate the supply of the products directly to you or to make alternative arrangements to ensure the supply of Products via an alternative distributor in North America. Should you be desirous of ordering products, we request that you please visit our website https://rlddesign.co.za/ to view our product offering and to contact us for a quote. We assure you that we will spare no effort or expense in bringing the production and supply of the products back up to speed.

Yours faithfully

**RLD DESIGN (PTY) LTD**
Per: Riaan Ludik